UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

CAROLYN D. WATTS, PERSONAL        )
REPRESENTATIVE OF THE ESTATE OF )
TAISUKE MATSUO, DECEASED,         )
        Plaintiff,               )
                        )
    vs.                          )          1:07-cv-0434-RLY-TAB
                        )
AMERICAN AIRLINES, INC. and AMR   )
CORPORATION,                      )
        Defendants.              )

## ENTRY ON DEFENDANTS' MOTION TO DISMISS

Plaintiff, Carolyn D. Watts ("Plaintiff"), as the personal representative of the estate

of Taisuke Matsuo ("Matsuo"), brings the instant suit against American Airlines, Inc. and

AMR Corporation (collectively "American Airlines"), under Article 17 of the Montreal

Convention.  American Airlines now moves to dismiss the Complaint.  For the reasons

explained below, the court **DENIES** the motion.

## I.  Factual Background

Matsuo lived in Indianapolis, Indiana, with his wife, the Plaintiff herein.

(Complaint ¶ 1).  On April 6, 2005, Matsuo flew from the Indianapolis International

Airport ("IND") to Tokyo Narita International Airport ("NRT") on an American Airlines

flight with an en route connection at Chicago O'Hare International Airport ("ORD").  (*Id*.

¶¶ 11-13).  Matsuo returned from NRT to ORD on April 13, 2005, on American Airlines

flight 154. (*Id*. ¶ 14). During the flight, Matsuo left his seat to use the lavatory on the aircraft and locked the door. (*Id*. ¶¶ 15-16). Matsuo suffered a heat attack while in the lavatory. (*Id*. ¶ 18). Flight 154 landed at ORD with Matsuo locked in the lavatory, and upon arrival at the gate, the passengers and crew exited the aircraft. (*Id*. ¶¶ 19-20). Matsuo was discovered locked in the lavatory by cleaning personnel and later pronounced dead by the Chicago Police Department. (*Id*. ¶¶ 23-25).

Plaintiff alleges American Airlines violated industry standards of care and their own policies and procedures by, *inter alia*, failing to respond to a medical emergency involving Matsuo, and by failing to recognize and/or respond to visible or verbal indications that Matsuo was having a heart attack aboard the aircraft. (*Id*. ¶¶ 30(d),(e)).

## II.    Dismissal Standard

When considering a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court examines the sufficiency of the complaint, not the merits of the lawsuit. Fed. R. Civ. P. 12(b)(6); *United States v. Clark County, Ind.*, 113 F.Supp.2d 1286, 1290 (S.D. Ind. 2000). The court will dismiss a complaint for failure to state a claim only if it "'appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Hamlin v. Vaudenberg*, 95 F.3d 580, 583 (7th Cir. 1996) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)). In making its determination, the court accepts the allegations in the complaint as true, and it draws all reasonable inferences in favor of the plaintiff. *Mallett v. Wisconsin Div. of Vocational Rehabilitation*, 130 F.3d 1245, 1248 (7th Cir. 1997); *Porter v. DiBlasio*, 93

F.3d 301, 305 (7th Cir. 1996).

## III.   Discussion

### A.   Background of the Warsaw and Montreal Conventions

"The Warsaw Convention was an international treaty created in the early days of airline travel, which sought to create the conditions under which the then extremely fragile industry could grow, by limiting airline accident liability." *Weiss v. El Al Israel Airlines, Ltd.*, 433 F.Supp.2d 361, 364 (S.D.N.Y. 2006) (citation omitted).  The purpose of the Warsaw Convention (drafted in 1929) was to create a uniform body of rules governing international air carrier liability.  *Id.*

The Montreal Convention (effective Nov. 4, 2003) "is not an amendment to the Warsaw Convention"; rather, it "is an entirely new treaty that unifies and replaces the system of liability that derives from the Warsaw Convention." *Ehrlich*, 360 F.3d at 371 n.4.

> Whereas the primary aim of the contracting parties to the [Warsaw] Convention was to limit the liability of air carriers in order to foster the growth of the . . . commercial aviation industry, the contracting parties to the Montreal Convention expressly approved that treaty because, among other reasons, they recognized the importance of ensuring protection of the interests of consumers in international carriage by air and the need for equitable compensation based on the principle of restitution.

*Weiss*, 433 F.Supp.2d at 365 (quoting *Ehrlich*, 360 F.3d at 371 n.4) (internal citations and quotation marks omitted)).  Thus, "the Montreal Convention has been described as 'a treaty that favors passengers rather than airlines.'" *In re Air Crash at Lexington, KY*, – F.Supp.2d – , 2007 WL 1876456, at *4 (E.D. Ky. June 26, 2007) (quoting *Ehrlich*, 360

F.3d at 371 n.4).

Despite the fact that the Montreal Convention is a new treaty, it contains provisions which embrace similar language as the Warsaw Convention so as not to result in a complete upheaval of the "common law" surrounding the Warsaw Convention. *In re Air Crash at Lexington, KY*, 2007 WL 1876456, at *4 (E.D. Ky. June 26, 2007). For example, Article 17 of the Montreal Convention, which applies to the facts of this case, contains nearly identical language as that contained in Article 17 of the Warsaw Convention. "[I]t is [therefore] expected that [Article 17 of the Montreal Convention] will be construed consistently with the precedent developed under the Warsaw Convention and its related documents." *Id.* (citing *Article-by-Article Analysis of the Convention*, 1999 WL 33292734, Article 17 comment).

### B.      Article 17 of the Montreal Convention

Article 17 of the Montreal Convention[1] imposes liability on an air carrier for a passenger's injury or death caused by an 'accident' during an international flight. *See Olympic Airways v. Husain*, 540 U.S. 644, 646 (2004) (applying the Warsaw Convention). Specifically, the Article provides, in pertinent part:

---

[1] The language of Article 17 of the Warsaw Convention provides:

The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

*Id.* at 649 (quoting 49 Stat. 3018).

> The carrier is liable for damage sustained in case of death or bodily injury of a passenger upon condition only that the accident which caused the death or injury took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

*See* Convention for the Unification of Certain Rules for International Carrier by Air, May 28, 1999 (Montreal Convention), *reprinted in* S. Treaty Doc. No. 106-45, 1999 WL 33292734 (2000). The dispositive issue before the court is whether Matsuo's heart attack constitutes an "accident" for purposes of Article 17 of the Montreal Convention. As there are no reported cases dealing with this specific issue, the court will construe Article 17 of the Montreal Convention in accordance with the precedent developed under the Warsaw Convention.

## C.    Definition of "Accident" and Its Application to the Facts of This Case

The Supreme Court has defined an "accident" to mean an "unexpected or unusual event or happening that is external to the passenger, and not to the passenger's own internal reaction to the usual, normal, and expected operation of an aircraft." *Husain*, 540 U.S. at 646 (quoting *Air France v. Saks*, 470 U.S. 392, 405-06 (1985)).

In *Saks*, the plaintiff boarded an Air France jetliner in Paris destined for Los Angeles. 470 U.S. at 394. As the airplane descended to Los Angeles, plaintiff felt pressure and pain in her left ear. *Id*. The plaintiff disembarked the plane without informing any Air France employee. *Id*. The plaintiff went to a doctor five days later, and learned that she had become permanently deaf in her left ear. *Id*. The Supreme Court held that the plaintiff's permanent loss of hearing proximately caused by the normal

5

operation of the aircraft's pressurization system was not an "accident" because "the injury was her own internal reaction to the normal pressurization of the aircraft's cabin." *Id*. at 1346.

In *Husain*, the plaintiff and her husband boarded an aircraft for their return flight back to the United States from Cairo.  540 U.S. at 647.  The plaintiff and her husband, who suffered from asthma, asked for seats in the non-smoking section of the aircraft as plaintiff's husband was sensitive to smoke.  *Id*.  After boarding the aircraft, the plaintiff and her husband discovered that they were only three rows in front of the smoking section.  *Id*.  Plaintiff's wife made repeated requests to the stewardess that they be moved as the plaintiff was "allergic to smoke."  *Id*.  The stewardess ignored those requests.  *Id*. at 647-48.  The plaintiff ultimately died of an asthmatic attack due to the ambient smoke in the aircraft.  *Id*. at 648.

In finding the aircraft liable, the Supreme Court cited to the *Saks* decision for the proposition that an accident can be the product of a chain of causes; thus, the plaintiff need only show that "'some link in the chain was an unusual or unexpected event external to the passenger.'"  *Id*. at 652 (quoting *Saks*, 470 U.S. at 406).  The Supreme Court therefore held that an "accident" had occurred within the meaning of the Warsaw Convention because of the airline's unusual and unexpected refusal to assist the passenger, which resulted in the passenger's preexisting medical condition being aggravated by exposure to a normal condition in the aircraft cabin.  *Id*. at 646.

The final case worth noting is *Fulop v. Maley Hungarian Airlines*, 175 F.Supp.2d

6

651 (S.D.N.Y. 2001).  In *Fulop*, the plaintiff was a passenger on an international flight from Budapest to New York.  *Id*. at 652.  Shortly after takeoff, he began to experience chest pains similar to those he had experienced during a previous heart attack.  *Id*.  He asked for a diversion of the flight to England.  *Id*.  The request was refused.  *Id*.  Once the plane landed, the plaintiff was transferred to a nearby hospital and eventually underwent triple bypass surgery.  *Id*.  Plaintiff claimed that he suffered permanent heart injuries due to the delay in treatment.  *Id*.

In denying the defendant airline's motion for summary judgment, the court reasoned as follows:

> In other words, Fulop suffered an initial injury caused entirely by his own internal condition and unrelated to the operation of the aircraft.  But the relevant injury caused by an alleged "accident" was not the initial heart attack which plaintiffs concede, but the subsequent aggravated harms, for Fulop also may have suffered additional complications and graver injuries proximately attributable to the flight crew's conduct that conceivably would not have occurred had the carrier's personnel adhered to established operational standards, rules or policies applicable to the circumstances.

*Id*. at 663-64.

Plaintiff has included an allegation in her Complaint that American Airlines violated "industry standards of care and the airline's own policies and procedures by failing to attend to a medical emergency involving Mr. Matsuo which occurred aboard an American Airlines aircraft; and failed to recognize and/or respond to visible or verbal indications that Mr. Matsuo was having a heart attack aboard the aircraft."  (Complaint ¶ 30(d), (e)).  Taking these allegations of Plaintiff's Complaint as true, the court finds that

there are a set of facts which would entitle Plaintiff to relief.  Although Matsuo's heart attack was caused by his own internal condition and was unrelated to the operation of the American Airlines aircraft, American Airlines' unusual or unexpected failure to recognize and/or respond to Matsuo's heart attack, and its failure to conform to industry custom and practices by responding to his medical emergency, could constitute a link in the chain of the events causing the ill-fated "accident" on board Flight 154.  Accordingly, American Airlines' Motion to Dismiss must be **DENIED**.

## IV.   Conclusion

For the reasons stated above, the court **DENIES** Defendants' Motion to Dismiss (Docket # 17).

**SO ORDERED** this  10th   day of October 2007.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic Copies to:

Austin W. Bartlett
ADLER MURPHY & MCQUILLEN LLP
abartlett@amm-law.com

Pfenne Peter Cantrell
KIGHTLINGER & GRAY
pcantrell@k-glaw.com

D. Bruce Kehoe
WILSON KEHOE & WININGHAM
kehoe@wkw.com

Michael G. McQuillen
ADLER MURPHY & MCQUILLEN LLP
mmcquillen@amm-law.com

Christopher J. Raistrick
ADLER MURPHY & MCQUILLEN LLP
craistrick@amm-law.com

Steven Edward Springer
KIGHTLINGER & GRAY
sspringer@k-glaw.com

Christopher G. Stevenson
WILSON KEHOE & WININGHAM
cstevenson@wkw.com